UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| HENDRIK DELIVERY SERVICE, INC., ) <br> ) <br> Plaintiff(s), ) <br> ) <br> vs. ) <br> ) <br> ST. LOUIS POST-DISPATCH LLC, ) <br> ) <br> Defendant(s). ) | Case No. 4:07CV1516 JCH |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant St. Louis Post-Dispatch LLC's ("Post-Dispatch") Motion to Vacate in Part an Arbitration Award, filed August 27, 2007. (Doc. No. 6). The matter is fully briefed and ready for disposition.

## BACKGROUND

Plaintiff Hendrik Delivery Service, Inc. ("Hendrik") is a family business owned by Larry Bunk, his wife Jane, and his parents, Hank and Mary. (Memorandum in Opposition to Defendant St. Louis Post-Dispatch LLC's Motion to Vacate in Part Arbitration Award and in Support of Hendrik's Application for Confirmation of Arbitration Award ("Hendrik's Opp."), P. 2). The relationship between Hendrik and the Post-Dispatch originated in November, 1993, and was governed by a four-page written agreement (the "Agreement"), in which the parties agreed to a set of rules for compensating Hendrik for delivery of the Post-Dispatch newspapers within Hendrik's two designated delivery routes. (Memorandum in Support of Defendant St. Louis Post-Dispatch's Motion to Vacate in Part an Arbitration Award ("Post-Dispatch's Memo in Support"), P. 1). The Agreement provided in relevant part as follows:

    4.    <u>Delivery</u>

> (a) The Carrier (Hendrik) agrees to deliver the daily and Sunday St. Louis Post-Dispatch to the home delivery subscribers of Publisher (Post-Dispatch). Such delivery services shall be performed in compliance with the performance standards as set forth in Exhibit A, attached hereto, and any subsequent amendment(s) to Exhibit A. Publisher may amend the performance standards upon ten (10) days prior written notice to meet operational requirements, as determined by the Publisher in its sole reasonable discretion, for proper delivery of the daily or Sunday St. Louis Post-Dispatch.
>
> (b) If Carrier demonstrates to Publisher that as a direct result of an amendment to Exhibit A or other significant change in Publisher's operations (excluding any changes in the size or number of newspapers delivered), Carrier incurs reasonable additional expenses (including additional time worked) that exceed two percent (2%) of Carrier's annual operating expenses, then Publisher shall pay Carrier additional compensation in an amount so as to enable Carrier to recoup such additional expenses. If the parties cannot agree on the amount of additional compensation within thirty (30) days of Carrier's demonstration, then within ten (10) days thereafter, Carrier, as its exclusive remedy may submit the matter to arbitration pursuant to Paragraph 9(c) with the sole issue being the amount, if any, of fee or additional compensation which must be provided to enable Carrier to recoup any additional reasonable expenses Carrier must incur.

(Agreement, attached to Post-Dispatch's Motion to Vacate as Exh. 1, ¶ 4(a), (b)).

In February, 2006, Hendrik submitted a claim for reimbursement of $466,330.00 in expenses allegedly incurred over the prior twelve years. (Post-Dispatch's Memo in Support, P. 1). The claim included a forty-page analysis prepared by Hendrik's retained forensic accountant. (Hendrik's Opp., P. 2). The Post-Dispatch disputed the claim[1], and then terminated Hendrik's contract in its entirety. (Post-Dispatch's Memo in Support, P. 1).[2]

The parties submitted the matter to arbitration, and a First Preliminary Hearing ("FPH") was held on October 25, 2006. (Arbitrator's Award ("Award"), attached to Post-Dispatch's Notice of

---

[1] According to Hendrik, the Post-Dispatch never contacted anyone at Hendrik to discuss the claim, but instead followed its alleged policy of summarily denying all expense claims submitted by carriers. (Hendrik's Opp., P. 3).

[2] The Post-Dispatch claimed termination of the contract was justified under the Agreement, as the expense claim involved alleged misrepresentations of fact. (Post-Dispatch's Memo in Support, P. 4).

Removal as Exh. A). According to the Arbitrator, two important stipulations were entered into during the FPH, as follows:

> In response to the Arbitrator's concern that some of the issues now contained in the various amendments to the Claim did not seem to fall within the scope of the arbitration clauses of the St. Louis Post-Dispatch Home Delivery Service Agreement ("Service Agreement") the parties' counsel represented that they had an agreement that all matters at issue in this Claim, as amended, will be decided in this Arbitration, irrespective of the arbitration clauses in the Service Agreement. At the Arbitrator's request, this agreement was orally stipulated to during the FPH. The second matter of concern was the requirement in the [Large, Complex Commercial Disputes] rules that, unless both parties agreed to a single arbitrator, three were required. The parties' counsel then stipulated that this Arbitrator would be the sole arbitrator for the claim.

(Id., PP. 1, 2). An arbitration hearing was conducted from May 14-18, 2007. (Post-Dispatch's Memo in Support, P. 4; Hendrik's Opp., P. 3). The Arbitrator then requested detailed written briefs on the numerous legal issues presented, which both parties provided. (Hendrik's Opp., PP. 3-4).

The Arbitrator issued his Award on June 26, 2007. In his Award, the Arbitrator first held Hendrik had satisfied its burden of proving the Post-Dispatch made a number of changes to its distribution system, which in turn caused Hendrik to incur additional expenses. (Award, P. 3). The Arbitrator ordered reimbursement for the unilateral changes alleged in Count I, in the amount of $482,169.00.[3] (Id., P. 5). The Arbitrator further found for Hendrik on its claims of breach of contract for the termination of Hendrik's contracts, tortious interference with a business expectancy, malicious trespass to personal property, and conversion (Counts II-V). (Id., PP. 5-8). As damages for those claims, the Arbitrator awarded Hendrik's asserted property value of the routes themselves,

---

[3] The Post-Dispatch does not challenge this portion of the Arbitrator's Award. (Post-Dispatch's Memo in Support, P. 2 n. 1).

$892,082.00. Finally, the Arbitrator found an award of punitive damages was warranted, and thus awarded an additional $750,000.00, for a total monetary award of $2,124,251.00. (Id., PP. 8-11).[4]

When the Post-Dispatch failed to satisfy its obligations under the Award, Hendrik filed an Application for Confirmation of Arbitration Award in Missouri State Court on July 30, 2007. (Application for Confirmation of Arbitration Award, attached to Post-Dispatch's Notice of Removal). On August 27, 2007, Defendant Post-Dispatch removed the action to this Court, on the basis of diversity jurisdiction. (Doc. No. 1-1). That same day, the Post-Dispatch filed the instant Motion to Vacate in Part an Arbitration Award, requesting that this Court vacate the portion of the Award directed to Counts II-V, including the award of punitive damages. (Doc. No. 6).

**DISCUSSION**

**I.  Does The Federal Arbitration Act Or The Missouri Arbitration Act Apply To This Case?**

As an initial matter, the Court must decide whether the provisions of the Federal Arbitration Act ("FAA") or the Missouri Arbitration Act apply in this case. The FAA provides in relevant part as follows:

> A written provision in any maritime transaction or *a contract evidencing a transaction involving commerce* to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (emphasis added). The statute further defines "commerce" to include "commerce among the several States." 9 U.S.C. § 1. In Allied-Bruce Terminix Companies, Inc. v. Dobson, the

---

[4] The Arbitrator ordered the Award to be paid within thirty days of the date of the Award, and further awarded both pre-Award and post-Award interest at a rate of 9% per annum. (Award, P. 11). Finally, the Arbitrator awarded Hendrik $19,912.50 in arbitration costs and expenses. (Id.).

- 4 -

United States Supreme Court interpreted the word "involving" broadly, holding its use signaled Congress' intent to exercise its commerce power to the full. Allied-Bruce Terminix Companies, Inc. v. Dobson, 513 U.S. 265, 277, 115 S.Ct. 834, 841, 130 L.Ed.2d 753 (1995). Thus, "[b]ecause the statute provides for the enforcement of arbitration agreements within the full reach of the Commerce Clause, it is perfectly clear that the FAA encompasses a wider range of transactions than those actually "in commerce"--that is, within the flow of interstate commerce." Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 56, 123 S.Ct. 2037, 2040, 156 L.Ed.2d 46 (2003) (internal quotations and citations omitted).

Upon consideration, the Court holds the Agreement between Hendrik and the Post-Dispatch involved "commerce," sufficient to invoke the FAA. Specifically, the Court notes the Agreement was between contracting parties in different states[5], and the Post-Dispatch is distributed in both Missouri and Illinois. (Post-Dispatch's Reply, P. 9). See Citizens Bank, 539 U.S. at 56-57 (application of FAA not defeated where individual transaction had no substantial effect on interstate commerce, as long as economic activity in the aggregate did so). Further, it is undisputed the Post-Dispatch regularly publishes news stories gathered by national and international wire services, and that a substantial portion of the newspaper's advertising revenues come from non-Missouri sources. (Post-Dispatch's Reply, P. 9). Finally, the Post-Dispatch utilizes reporters, writers, syndicated columnists, and other employees located in states other than Missouri, and relies on substantial amounts of paper and other raw materials that are shipped into Missouri from other states. Id., PP. 9-10; see also Stewart v. Birmingham News Co., 786 So.2d 464, 468-69 (Ala. 2000) (plaintiff newspaper

---

[5] While Hendrik is in Missouri, it is undisputed that the Post-Dispatch is a non-Missouri company, comprised of other non-Missouri companies, each of which distributes newspapers throughout the country. (Reply Memorandum in Support of Defendant St. Louis Post-Dispatch's Motion to Vacate in Part an Arbitration Award ("Post-Dispatch's Reply"), P. 8).

distributors were required to deliver advertising inserts and news content obtained by defendant through interstate commerce, and thus were "integral and inseparable parts of the flow of interstate commerce"), cert. denied, 532 U.S. 1019 (2001); Brookfield R-III School Dist. v. Tognascioli Gross Jarvis Kautz Architects, Inc., 845 S.W.2d 103, 104-05 (Mo. App. 1993) (contract involving use of materials shipped to project through interstate commerce and utilizing personnel who crossed state lines to work on project involved interstate commerce within contemplation of the FAA); Kagan v. Master Home Products Ltd., 193 S.W.3d 401, 405, 408 (Mo. App. 2006) (same). Based on the foregoing, this Court finds the provisions of the FAA govern the instant dispute.

## II. Standard Of Review

Under Eighth Circuit law, this Court's review of an arbitration award, "generally involves two inquiries: (1) Did the parties agree to arbitrate? and (2) Did the arbitrator have the power to make the award that he made?" Trailmobile Trailer, LLC v. International Union of Electronic, Elec., Salaried, Mach. and Furniture Workers, AFL-CIO, 223 F.3d 744, 746 (8th Cir. 2000) (citation omitted). Only the answer to the second question is at issue here. Id.[6]

"Judicial review of a final arbitration decision is extremely narrow." Trailmobile Trailer, 223 F.3d at 746. In fact, "[c]ourts may not review the merits of an arbitration award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." Gas Aggregation Services, Inc. v. Howard Avista Energy, LLC, 319 F.3d 1060, 1064 (8th Cir. 2003) (internal quotations and citations omitted). Rather, the Court must confirm the award, "even if [it is] convinced that the arbitrator committed serious error, so long as the arbitrator is even arguably

---

[6] The Post-Dispatch does not dispute the Arbitrator's contention that the parties agreed to arbitrate all matters at issue in the Second Amended Demand for Arbitration. (Award, PP. 1-2). Further, the Agreement itself contained the following provision: "The arbitrator's determination on any matters properly before it shall be final and binding." (Agreement, ¶ 9(e)).

construing or applying the contract and acting within the scope of his authority." Boise Cascade Corp. v. Paper Allied-Indus., Chemical and Energy Workers, 309 F.3d 1075, 1080 (8th Cir. 2002) (internal quotations and citations omitted).

Arbitration awards are not entirely free from judicial review, however. For example, the FAA provides limited grounds on which the award may be vacated, such as when it was procured through corruption, fraud, or undue means; when there was evident partiality or corruption in the arbitrators; when there was misconduct by the arbitrators; or when the arbitrators exceeded their powers. 9 U.S.C. § 10(a). Furthermore, the Eighth Circuit has held that an arbitration award may be vacated when it is, "completely irrational," or "evidences a manifest disregard for the law." See Gas Aggregation Services, 319 F.3d at 1065 (internal quotations and citations omitted).[7] "For example, the arbitrator may not disregard or modify unambiguous contract provisions." Trailmobile Trailer, 223 F.3d at 747 (citation omitted). "On the other hand, where the plain language of the parties' agreement is silent or ambiguous with respect to a disputed issue, an arbitrator is obliged to consider other relevant sources of the parties' intent." Boise Cascade Corp., 309 F.3d at 1082 (citation omitted); see also Gas Aggregation Services, 319 F.3d at 1065.

With these guidelines in mind, the Court now turns to a review of the disputed rulings rendered by the Arbitrator.

**III.     Was The Arbitrator Justified In Holding Hendrik Acquired Property Rights To Its Routes Under The Agreement?**

---

[7] Under Eighth Circuit law, an arbitration award is irrational when it, "fails to draw its essence from the agreement." Stark v. Sandberg, Phoenix & Von Gontard, P.C., 381 F.3d 793, 799 (8th Cir. 2004) (internal quotations and citation omitted), cert. denied, 544 U.S. 1000 (2005). It "manifests disregard for the law where the arbitrators clearly identify the applicable, governing law and then proceed to ignore it." Id.

- 7 -

In Miskimen v. Kansas City Star Co., the Missouri Court of Appeals held that the plaintiff independent subscription carriers of defendant newspaper publisher held a proprietary interest in their routes. Miskimen v. Kansas City Star Co., 684 S.W.2d 394 (Mo. App. 1984). The court held the publisher was equitably estopped from invoking the termination provision of its contracts with the carriers, because for over ninety years the publisher had behaved as though the carriers held a proprietary interest in and owned their routes. Id. at 400-401.[8]

According to the Post-Dispatch[9], it was in reaction to the Miskimen decision that the Post-Dispatch renegotiated its contract with its carriers to include the following provision:

> 14(b). In consideration of the right granted to Carrier pursuant to this Agreement, the validity and sufficiency of which is hereby acknowledged, Carrier, on behalf of itself and its heirs, successors, executors, administrators and assigns (hereinafter "Heirs"), hereby waives any and all rights which it may now or hereafter have under any statute, law, ordinance, common law principle or otherwise, to effect, by any means, the continuation of this Agreement or any rights granted pursuant hereto, or the payment of any compensation to Carrier or his Heirs as a result of any termination, expiration, forced assignment or cancellation (hereinafter collectively referred to as "termination") of this Agreement, except as expressly provided for in this Agreement. Without limiting the foregoing, Carrier hereby waives any alleged property rights which Carrier may now or hereafter have in any Carrier route, territory, customers or customer lists and any right to any compensation based upon any principle of waiver or estoppel or any other principle. The rights of the parties hereto including their Heirs with regard to any continuation of this Agreement or any compensation in connection with any termination or forced assignment or purchase hereof, are and shall be limited only to those express contractual rights as set forth in this Agreement.

---

[8] Specifically, the Missouri Court of Appeals noted that for decades the practice had been for the carriers to buy and sell their routes; for carriers to use their routes as collateral for loans; and for carriers to designate their spouses or children as successors to their routes upon a carrier's death. Miskimen, 684 S.W.2d at 396, 397. Further, the court found the publisher's management itself made public statements acknowledging the carriers' ownership of their routes. Id. at 397.

[9] See Post-Dispatch's Memo in Support, P. 7.

(Agreement, ¶ 14(b)). Despite this provision, in his Award the Arbitrator held as follows with respect to Hendrik's alleged property right:

> Under Missouri law, owners of newspaper routes have a property right in their routes. *Miskimen v. Kansas City Star Co.*, 684 S.W.2d 394, 396 (Mo. Ct. App. 1985). Credible evidence presented at the Hearing shows that, pursuant to the Service Agreement, the delivery routes were saleable for a price. Those sales were based on a multiple of a route's gross income, and had a long history of such route sales. The evidence further showed that the routes in the more affluent neighborhoods had the highest multiplier. Routes 411 and 414 were located in Ladue and Chesterfield, MO, two of the most affluent neighborhoods in the St. Louis area. The property rights principle is based on newspapers, including the Post-Dispatch, treating the routes as though they are property. Specifically, it is based on the history of financing the purchases of these routes and using the routes as collateral for the financing. By posting the routes as collateral--with the Post-Dispatch's consent--the financiers were given "lien" rights on the routes. These facts are very similar to the facts presented in *Miskimen*.
>
> Because of the similarity, the Arbitrator finds that *Miskimen* is controlling and the Post-Dispatch's ambiguous waiver provision hidden away in Section 14(b) does not negate this property right. While the effect of the provision is questionable to begin with, the Arbitrator finds that the Post-Dispatch should be estopped from relying on this provision as it is directly contrary to the history of treating these routes as though they were property. This history of treatment began before the Post-Dispatch instituted its contract, and it continued unabated after the contract was introduced.

(Award, PP. 6-7).

In its Memorandum in Support of its Motion to Vacate, the Post-Dispatch claims Section 14(b) of the Agreement represented an unambiguous waiver of any property rights Hendrik may have had in its routes. (Post-Dispatch's Memo in Support, PP. 6-8). The Post-Dispatch thus claims that because the Arbitrator lacked the authority to modify or ignore the unambiguous provision, all portions of the Award that rely on his disregard of § 14(b)'s property rights waiver were irrational and must be vacated. (Id., P. 8).

Upon consideration, the Court cannot agree that Section 14(b) constituted an unambiguous waiver of Hendrik's property rights. Rather, the Court finds the condition must be read in the context

of the Agreement as a whole, which contained the following additional relevant provision: "Carrier has the right to sell and assign all or any portion of its rights and obligations under this Agreement at any time to any person for such compensation or payment as may be agreed upon between Carrier and the assignee,...." (Agreement, ¶ 8). This provision seemingly granted Hendrik property rights in its routes, and thus the Court finds that ambiguity existed within the terms of the Agreement itself. Under Eighth Circuit law, the Arbitrator therefore was obligated to utilize other sources to determine the parties' intent. Gas Aggregation Services, 319 F.3d at 1065. The language of the Award demonstrates he fulfilled this obligation, by considering the Post-Dispatch's history of treating the routes as property, both by permitting their sales, and by financing the purchases of the routes through use of the routes as collateral. (Award, PP. 6-7). The Court thus finds that with his Award, the Arbitrator did not dispense his own brand of "industrial justice," see Boise Cascade Corp., 309 F.3d at 1084, but rather exercised the authority granted to him by the parties to interpret the provisions of the Agreement. Under these circumstances, the Court finds the Arbitrator's ruling that the routes constituted property must be upheld.

### IV. Was The Arbitrator Justified In Making His Award Of Compensatory Damages?

As stated above, the Arbitrator awarded the value of the routes, $892,082.00, as damages for the violations asserted in Counts II through V of Hendrik's Second Amended Demand for Arbitration. (Award, P. 11). The Arbitrator found Hendrik was entitled to the damages for each Count, but awarded the value of the routes only once, as the claims and damages were overlapping. (Id., P. 10). This Court thus finds that the award of compensatory damages must stand, as long as it was justified for at least one Count.

In Count V of its Second Amended Demand for Arbitration, Hendrik asserted a claim for conversion. After finding that the routes constituted Hendrik's property, a holding this Court has now affirmed, the Arbitrator continued to hold as follows:

> As stated above, Hendrik possessed a property right in Routes 411 and 414. Through its actions on April 30, 2006, the Post-Dispatch seized control of the routes and deprived Hendrik of its right to own, operate and control the routes. As such, the Post-Dispatch is liable for conversion of the routes.
>
> Hendrik is awarded $892,082.00 for Count V.

(Award, P. 8).

Under Missouri law, "[c]onversion is the unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's rights." Green Valley Seed, Inc. v. Plenge, 72 S.W.3d 601, 603 (Mo. App. 2002) (internal quotations and citations omitted). Further, "[c]onversion can occur in three ways: 1) by tortious taking; 2) by any use or appropriation to the use of the person in possession, indicating a claim of right in opposition to [the] owner's rights; or 3) by refusal to give up possession to the owner on demand, even though the defendant's original possession of the property was proper." Id. (internal quotations and citations omitted).

Upon consideration, the Court finds the Arbitrator made the requisite findings, sufficient to determine the Post-Dispatch committed the tort of conversion. The Court finds the holding was not "completely irrational," nor did it "evidence[] a manifest disregard for the law." Gas Aggregation Services, 319 F.3d at 1065 (citations omitted).[10] The Court thus affirms the Arbitrator's finding that the Post-Dispatch committed the tort of conversion.[11]

---

[10] To the extent the Arbitrator's finding of conversion relied on his earlier ruling that the Post-Dispatch's termination of the contract was not justified under § 9(h) of the Agreement, the Court holds that under its limited scope of review, the earlier ruling was acceptable as well.

[11] As stated above, the Arbitrator awarded the full property value of the routes, $892,082.00, as damages for the breach of Count V. (Award, P. 8). Thus, in light of the above ruling confirming

## V.  Was The Arbitrator Justified In Making His Award Of Punitive Damages?

In its final argument in favor of vacating the Award, the Post-Dispatch asserts punitive damages were not available in this case. (Post-Dispatch's Memo in Support, PP. 14-15). By way of support, the Post-Dispatch first maintains that because tort remedies were unavailable, punitive damages could not be awarded. (Id., P. 14).[12] The Post-Dispatch continues to assert that even if the tort findings are upheld, the punitive damages award nevertheless must be vacated, as Hendrik failed to present clear and convincing evidence of evil motive and reckless indifference to Hendrik's rights. (Id., citing Romeo v. Jones, 144 S.W.3d 324, 334 (Mo. App. 2004)).

In the portion of his Award addressing the issue of punitive damages, the Arbitrator held as follows:

> On Page 31 of the Post-Dispatch's Post-Hearing Brief, Respondent sets forth the Missouri standard for the award of punitive damages. In part, that which is set forth in Footnote 19 states, "For an award of punitive damages to stand, it must be established that the defendant acted, at the least, with legal malice which is shown by intentional, knowing commission of a wrongful act without just cause or excuse, and in contravention of, or reckless disregard for the rights of others". What follows is the Arbitrator's rationale for an award of punitive damages in this Arbitration.
>
> The evidence in this case has demonstrated the Post-Dispatch's systemic disregard for the rights of carriers. Messrs. Helm and Hollingsworth testified to the Post-Dispatch's "policy" of denying every expense claim, regardless of its individual merit. Mr. Vasquez testified as to the pressure put on him to comply with the Post-Dispatch's unreasonable (and perhaps illegal) demands. Mr. Kiley testified as to the

---

the finding of conversion, the Court need not address the Post-Dispatch's assertions that the Arbitrator's award for breach of contract in Count II ignored the plain language of the contract, and that the Post-Dispatch could not have interfered with a valid business expectancy. (See Post-Dispatch's Memo in Support, §§ II, III(C)). Further, the Court rejects the Post-Dispatch's assertion in § III(A) that the Award was impermissible because a breach of contract cannot form the basis for tort liability, as in the instant case the acts committed constituted a tort independent of the contract. See Khulusi v. Southwestern Bell Yellow Pages, Inc., 916 S.W.2d 227, 230 (Mo. App. 1995).

[12] In Sections III and IV, supra, this Court has held tort remedies were available in the instant case.

threats made to carriers by the Post-Dispatch. Mr. Bunk testified about thirteen years of threats and intimidation.

The evidence has demonstrated how openly and notoriously this behavior has been displayed. The Post-Dispatch refers to its acquisitions of carrier routes as "opportunistic" in its public filings. Its contracts contain "penalty" provisions labeled as such. Even in this case, the Post-Dispatch openly retaliated against Hendrik stating that the termination was based on the contents of Hendrik's expense claim.

The Post-Dispatch has taken one unreasonable position after another. It has attempted to bar Hendrik's claims based on the fact that the Post-Dispatch terminated the contract before this arbitration was filed. It has attempted to rely on overreaching contractual provisions that have been ruled unenforceable by controlling authority.

The Post-Dispatch has suspiciously destroyed documents but provided no evidence as to the exact nature or timing of the destruction. Moreover, Mr. Hollingsworth provided specific instructions that no documents regarding the investigation of Hendrik's claim were to be created. He stated that he did this because he knew the matter would end up in arbitration. As such, no documents regarding the Post-Dispatch's investigation were produced.

Mr. Hollingsworth's investigation of the Claim, as presented by Blackwell Sanders raises even more issues on his credibility. When he first received the Claim, his testimony was that he immediately called in legal counsel because he considered this a lawsuit. To perform the investigation, he hired John Young, who had retired, to do the investigation. Noteworthy is the fact that John Young apparently precipitated the Claim by demanding that Hendrik accommodate Richie Bry "or else". In addition, Mr. Hollingsworth instructed John Young that the investigation was to be made with no written records nor reports. At least one interpretation of this 'no written report' order could be that Mr. Hollingsworth did not desire that such a report be subjected to scrutiny at an arbitration hearing.

The Claim seemingly had such import that Mr. Hollingsworth took it to the highest Post-Dispatch management for review. The Arbitrator can only assume that legal counsel was present at Mr. Hollingsworth's meeting with top management and that top management made its decision or, at least, gave its approval to Mr. Hollingsworth's actions that took place thereafter even though there was no written report of John Young's investigation.

Another incident of this review for punitive damages for the Post-Dispatch's wrongful taking of Routes 411 and 414 from Hendrik has to be the testimony of Larry Bunk that when, sometime near June, 2001, the Route 414 delivery drop was moved to the Wildwood Depot. Mr. Bunk's comment to Larry Martin was answered, to the affect (sic) that, "I know this will cause problems; you should sell us your routes. I can take the routes on just one customer complaint. I will be watching you for just one slip".

> The Post-Dispatch has completely and perhaps irreparably traumatized the Bunk Family. The Post-Dispatch did so without any regard for the consequences of its actions or the rights of Hendrik Delivery Service. As Rick Plate put it, "it was of no concern." Most concerning is the fact that they would do it all over again if given the opportunity. Messrs. Helm and Hollingsworth testified as much.
>
> It is for these reasons that punitive damages must be awarded, both as a punishment for the Post-Dispatch's actions as well as a deterrent against future conduct.

(Award, PP. 8-10). Based on these findings, the Arbitrator awarded punitive damages in the amount of $750,000.00. (Award, P. 11).[13]

In its Memorandum in Support of its Motion to Vacate, the Post-Dispatch enumerates numerous perceived shortcomings in the Arbitrator's findings of fact and conclusions of law on the issue of punitive damages. (Post-Dispatch's Memo in Support, PP. 14-15). Upon consideration, however, the Court finds the Arbitrator's award of punitive damages was not "completely irrational," nor did it "evidence a manifest disregard for the law." See Gas Aggregation Services, 319 F.3d at 1065 (citations omitted).[14] This Court thus is powerless to substitute its own judgment for that of the Arbitrator's, and so the Post-Dispatch's Motion to Vacate the Arbitrator's award of punitive damages must be denied.[15]

## **CONCLUSION**

---

[13] Again, the Arbitrator explained that although Hendrik was entitled to punitive damages for Counts III, IV and V, the amounts would be counted only once, and were not apportioned. (Award, PP. 10-11).

[14] As stated above, an arbitration award "manifests disregard for the law where the arbitrators clearly identify the applicable, governing law and then proceed to ignore it." Stark, 381 F.3d at 799 (internal quotations and citation omitted). Manifest disregard of the law is more than a simple error of law, and this Court's, "disagreement with an arbitrator's interpretation of the law or determination of the facts is an insufficient basis for setting aside his award." Id. at 802 (internal quotations and citations omitted).

[15] The Court has considered and rejects Hendrik's request that the Court modify the Arbitrator's Award, to include double damages for malicious trespass to personal property. (See Hendrik's Opp., P. 13 n. 11).

Accordingly,

**IT IS HEREBY ORDERED** that the Motion of Defendant St. Louis Post-Dispatch LLC to Vacate in Part an Arbitration Award (Doc. No. 6) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant St. Louis Post-Dispatch's Request for the Presentation of Oral Argument (Doc. No. 15) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff Hendrik Delivery Service, Inc.'s Motion to Vacate Order Setting Rule 16 Teleconference (Doc. No. 18) is **GRANTED**.

**IT IS FURTHER ORDERED** that this matter is set for a telephonic status conference on **Thursday, October 25, 2007**, at **10:30 a.m.** Plaintiff is to initiate the phonecall. Chambers' phone number is (314) 244-7600.

Dated this 19th day of October, 2007.

/s/ Jean C. Hamilton
UNITED STATES DISTRICT JUDGE